UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY BRISTOW and MICHELLE BRISTOW, | No. 2:17-cv-02712-CKD |
| Plaintiffs, | |
| v. | ORDER |
| RICHARD ESTER, et al., | |
| Defendants. | |

Plaintiffs Danny Bristow and Michelle Bristow brought this civil rights action under 42 U.S.C. § 1983, claiming violations of their rights under the Second and Fourth Amendments in connection with a search of their home. This matter is before the undersigned for all purposes including trial and entry of judgment pursuant to the parties' consent and the court's order of March 31, 2023. (ECF No. 86.) A motion for summary judgment filed by defendants County of San Joaquin, Richard Ester, and Karen Sangster is before the court. (ECF No. 74.)

For the reasons set forth below, defendants' motion is granted in part and denied in part. The motion is granted as to the Monell claims, all claims against Karen Sangster, Danny Bristow's claims under the Second Amendment, and Michelle Bristow's excessive force claim. As to plaintiffs' claims under the Fourth Amendment against Detective Ester asserting an unreasonable search and seizure and for the alleged unreasonable detention of Michelle Bristow, the motion is denied.

1

## RELEVANT PROCEDURAL BACKGROUND

Danny Bristow, Michelle Bristow, and other plaintiffs who resided on the same parcel of land filed the operative amended complaint on March 29, 2018. (ECF No. 20.) Plaintiffs Danny Bristow and Michelle Bristow alleged that the County of San Joaquin Sheriff's Office forcibly entered their home on February 13, 2015, without a warrant, and without probable cause or exigent circumstances, to execute a SWAT style raid. (Id. at ¶¶ 15-17.) Michelle Bristow was home and was detained during execution of the search. (Id. at ¶¶ 20-24.)

On April 24, 2020, the court ordered the dismissal of several plaintiffs who were no longer participating in the case. (ECF No. 65.) On June 23, 2020, the court ordered the dismissal of defendant State of California. (ECF No. 66.) The City of Stockton was voluntarily dismissed by stipulation and a minute order on December 29, 2021. (ECF Nos. 71, 72.) Plaintiffs' claims against the County of San Joaquin defendants ("County defendants") remain and are at issue here.

On March 10, 2022, the County defendants filed the motion for summary judgment presently before the court. (ECF No. 74.) The motion is fully briefed with plaintiffs' opposition and the defendants' reply. (ECF Nos. 76, 79.)

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to obtain summary judgment, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

////

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 447 U.S. at 248.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

////

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

## UNDISPUTED FACTS[1]

As part of his duties as a detective with the County of San Joaquin County Sheriff's Department, Richard Ester was involved in an investigation into criminal activity involving sex related crimes and a person named Bryan Bristow at 4719 East Harvest Road, also known as 4715 East Harvest Road. More specifically, the property was identified as a 1.42-acre parcel with San Joaquin County parcel ID 01702014 (hereinafter referred to as the "Property".) (Undisputed Fact ("UF") 1.) Bryan Bristow was the brother of plaintiff Danny Bristow. (UF 21.)

The investigation culminated in Detective Ester obtaining a "Ramey" Warrant from the San Joaquin County Superior Court, in case number 14-22135, for the arrest of Bryan Bristow for failing to update sexual offender registration. (UF 2-5.) In addition to the Ramey Warrant, Detective Ester prepared and obtained a search warrant describing the Property to be searched as follows (hereinafter "Search Warrant"):

> YOU ARE THEREFORE COMMANDED TO SEARCH: THE PREMISES located at 4719 E. Harvest Road (also known as 4715 E. Harvest Road), Acampo California, 95220; Specifically, this property is identified by San Joaquin County parcel ID 01702014, consisting of 1.42 acres; further described as a white single store house with light green weathered trim and a brown composite roof. The residence is located on the north side of Harvest Road, with the front door facing south. The front door is secured by a black security door. There are two black mailboxes next to each other across from

---

[1] Except where specifically stated otherwise, all the facts in this section are undisputed.

>           the property, on the south side of Harvest Road, one labeled 4715
>           and the other labeled 4719, both in white. There is a wood sign with
>           black numbers facing south, above the front door that reads 4715,
>           with the number 5 modified to look like a 9. Including all rooms,
>           attics, basements, and other parts therein, the surrounding grounds
>           and any garages, storage rooms, trash containers, locked boxes,
>           vehicles, trailers, and outbuildings of any kind located thereon.

(UF 6-7.)

As part of the Ramey and Search Warrants, Detective Ester included the information in this paragraph in support of probable cause. (UF 8, 11-18.) A witness had reported criminal activity at the residence at 4715 or 4719 East Harvest Road in Acampo, California, and specifically, that he had seen pictures of women and children tied up and child pornography. (UF 11.) The witness talked about tunnels underneath the property used to hold children against their will. (Id.) Two registered sex offenders, Keith Bristow and Bryan Bristow, reportedly lived on the property and both had outstanding warrants for their arrest. (UF 11, 14, 17.) There were multiple houses on the property. (UF 11.) Bryan Bristow reportedly stayed at a house on the rear of the property. (Id.) It was believed that Bryan Bristow lived at the factual address of 4719 E. Harvest Road, though he had used 4715 E. Harvest Road in Acampo as a fictitious address. (UF 15.) Bryan Bristow was the recorded owner of 4719 E. Harvest Road in Acampo. (Id.)

On February 5, 2015, Detective Ester completed the Operating Plan for the execution of the Ramey and Search Warrants. (UF 19.) Detective Ester knew there were multiple houses on the Property. (UF 19, 22.)

Plaintiffs' house was one of three houses located on the Property. (UF 22.) Danny Bristow's sister lived in the middle house which had the addresses 4719 and 4715 on it. (UF 23.) When facing the property from East Harvest Road, the house to the left was labeled 4695 East Harvest Road and was occupied by the family of Danny Bristow's brother, Stephen Bristow. The house to the right, where plaintiffs lived, did not have a street address label. (UF 23, 25.)

Plaintiffs' house was a three-bedroom, one bath house with separate living room and dining room and was about 1300 square feet. (Plaintiffs' Separate Statement of Facts ("SSF") 3.) It had a detached garage connected to the house, a fenced front yard, French doors in the front, numerous windows, and a separate driveway from Harvest Road. (SSF 3.)

On February 13, 2015, at approximately 7:00 a.m., Detective Ester conducted a briefing for the execution of the Ramey and Search Warrants that day. (UF 20.) Detective Ester was personally present when the execution of the Ramey and Search Warrants began at approximately 9:08 a.m. (UF 31, 33.) Danny Bristow had already left for work and was not present. (UF 30.) Ultimately, neither Bryan Bristow nor Keith Bristow were located on the Property. (UF 77.)

Michelle Bristow woke up at approximately 9:00 or 9:15 a.m. when she heard law enforcement officers announce their presence outside. (UF 36.) She looked out and saw about five officers in tactical gear pointing guns at her. (SSF 9.) Michell Bristow opened the door to the officers and was handcuffed behind her back, escorted to a law enforcement vehicle in the driveway, and initially placed inside the vehicle. (UF 40, 43.) She was then transferred to a van where other people located on the Property were also being detained. (UF 44.) After being placed in the van, Michelle Bristow realized the handcuffs were too tight. (SSF 10; UF 64.) During the detention, Detective Ester spoke with Michelle Bristow, who did not voice any complaints about the tight handcuffs. (UF 54, 63.) During her detention, Michelle Bristow never advised any law enforcement officer that she needed medical attention of any kind. (UF 62.) She never asked for any food, water, or to use the bathroom. (UF 66, 68, 69.)

Michelle Bristow was released later that day with a Detention Certificate that she signed, but the parties dispute the length of the detention, as plaintiffs claim the time stated on the certificate was incorrect. (UF 52, 57, 58; SSF 14.) Under plaintiffs' evidence, Michelle Bristow was held handcuffed in the van for about six hours. (SSF 13.) After being released, she had indentations on her wrist from the handcuffs that lasted about three days. (SSF 11.)

During the search of plaintiffs' residence, law enforcement seized firearms belonging to Danny Bristow. (UF 79, 80, 89.) Danny Bristow had inherited these firearms from his father. (SSF 6.) The firearms were not registered to Danny Bristow on the date they were seized. (UF 80).

Firearms were also discovered in the residence labeled 4695 East Harvest Road, which was the residence occupied by Stephen Bristow. (UF 45.) Stephen Bristow was a convicted felon prohibited from possessing firearms. (UF 45.) Detective Ester requested that Detective Sangster

6

write an additional search warrant to seize the firearms and ammunition ("Firearms Warrant") from the residence labeled 4695 East Harvest Road. (UF 47.) Other than writing the Firearms Warrant, obtaining Judge Hoyt's signature, and delivering the Firearms Warrant to the staging area, Detective Sangster was not involved in the service and execution of the warrants or the arrest and detention of any suspects. (Id.)

## DISCUSSION

### I.     Detective Sangster

Defendants argue Detective Sangster's only part in the operation was to prepare the Firearms Warrant and deliver it to the scene. (ECF No. 74-1 at 21, 23.) Plaintiffs do not contest this assertion. There is no evidence of any involvement by Detective Sangster with the preparation or execution of the Search Warrant, or of any contact between Detective Sangster and either remaining plaintiff. The court grants the motion for summary judgment as to all claims against Detective Sangster.

### II.    Search of Plaintiffs' Home

As set forth above, the relevant facts are largely undisputed. However, the parties dispute whether the Search Warrant authorized the search of plaintiffs' house.

Defendants argue the scope of the Search Warrant included the entire Property and all buildings on it, including plaintiffs' unnumbered house. (ECF No. 74-1 at 16.) Defendants state the Search Warrant clearly identified the entire 1.42 acres that make up San Joaquin County parcel number 017202014 and everything on it. (Id.) Therefore, defendants argue, the search of plaintiffs' home was lawful. (Id. at 16, 19-21.)

Plaintiffs counter that the Search Warrant did not authorize any search of their home, because it identified the residence to be searched as "PREMISES located at 4719 E. Harvest Road (also known as 4715 E. Harvest Road) …" and described the house to be searched as "a white single story house with light green [weathered trim] and a brown composite roof… with the front door facing south. The front door is secured a black security door." (ECF No. 76 at 6.) Plaintiffs argue the Search Warrant authorized search of only one residence, the primary residence, which fit the description and had the described address posted on the house. Plaintiffs argue the Search

7

Warrant did not authorize search of any undescribed residence on the property, including their home. (Id.)

The Constitution provides protection against unreasonable searches and seizures and provides that no warrant shall issue unless "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., Amend. IV. The Warrant Clause categorically prohibits unreasonable searches of places inadequately described. Maryland v. Garrison, 480 U.S. 79, 84 (1987). In addition, because the home is accorded the full range of Fourth Amendment protections against unlawful searches and seizures, when law enforcement wishes to search two houses or other occupancy units, it must generally establish probable cause as to each. Mena v. City of Simi Valley, 226 F.3d 1031, 1038 (9th Cir. 2000). In the Ninth Circuit, probable cause exists to search a street address with more than one dwelling "if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect." Blight v. City of Manteca, 944 F.3d 1061, 1066-67 (9th Cir. 2019).

Here, plaintiffs' house was clearly a separate dwelling, and the parties' dispute focuses on the Search Warrant's particularity rather than probable cause. Defendants argue plaintiffs' reading of "PREMISES," as used in the Search Warrant, to mean only the described, primary house, is unreasonably restrictive. Defendants note, first, the dictionary definition of "premises" is "a tract of land with the buildings thereon" or "a building or part of a building usually with its appurtenances (such as grounds)." (ECF No. 79 at 7.) Defendants note, second, the Search Warrant specified the "… property is identified by San Joaquin County parcel ID 01702014, consisting of 1.42 acres" and included "all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, storage rooms, trash containers, locked boxes, vehicles, trailers, and outbuildings of any kind located thereon." (Id.)

A description is sufficiently particular if it "is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." Steele v. United States, 267 U.S. 498, 503 (1925). The particularity requirement protects the right to be free from unbounded general searches so that nothing is left to the discretion of the officer executing the warrant. United States v. Williams, 687 F.2d 290, 292 (9th Cir. 1982). In Williams, a warrant authorized

the search of "premises" located in the County of Josephine described as follows: "Canyon Creek Mine No. 1, 2, and 3 in Township 39 South, Range 9, Section [sic] 10 and 11, Willamette Meridian." 687 F.2d at 292. The Ninth Circuit held the use of the word "premises" reflected an intent that all structures, including a cabin, be searched. Id. at 293.[2] The Ninth Circuit rejected a contention that search of a dwelling cabin was unauthorized because it was not described with sufficient particularity. Id.

Because Williams did not involve multiple dwellings, see 687 F.2d at 292-93, it does support a conclusion that a warrant's direction to search "premises" authorizes search of multiple dwellings. "Federal courts have consistently held that the Fourth Amendment's requirement that a specific place be described when applied to dwellings refers to a single living unit (the residence of one person or family)." United States v. Hinton, 219 F.2d 324, 326 (7th Cir. 1955) (internal quotation marks omitted); see also United States v. Cannon, 264 F.3d 875, 879 (9th Cir. 2001) (rear building initially believed to be a garage was "a separate dwelling for which a separate warrant was required"); United States v. Alcazar-Barajas, 768 F. App'x 705, 706-07 (9th Cir. 2019) (search of one of two mobile homes on a property was not authorized by the warrant describing the other mobile home and other buildings on the property).

In Alcazar-Barajas, as in this case, "the government was aware, in advance of the search, that there were [multiple dwellings] on the property." 768 F. App'x at 707.

> [T]he warrant authorized the search of a "gray mobile home type structure," among other buildings on the property. But the mobile home where Alcazar-Barajas was found was white. And, perhaps more significantly, there were in fact two mobile homes on the property in (relative) close proximity to one another.

Id. at 706. The Ninth Circuit held that based on the totality of the circumstances, "the officers… should have known that Alcazar-Barajas' mobile home was a different living situation requiring officers to secure a new warrant." Id. (internal quotation marks omitted). Thus, the search of the undescribed mobile home was presumptively unreasonable. See id. at 707.

---

[2] The Tenth Circuit has rejected such a rule. See U.S. v. Dahlman, 13 F.3d 1391, 1396 (10th Cir. 1993). In the Tenth Circuit, "when officers intend to search a residence, an ambiguous warrant describing only the lot of land to be searched is inconsistent with the Fourth Amendment's particularity requirements..." Id.

In this case, while directing search of the "PREMISES," the Search Warrant described a single residence which was clearly not the plaintiffs' residence. The Search Warrant and Affidavit did not contain a description of, or any discernible reference to, plaintiffs' home. (See ECF No. 74-8 at 14-22.) Plaintiffs' separate house "cannot be viewed as an extension of the main house." Cannon, 264 F.3d at 879. Applying the broad construction of the term "premises" urged by defendants to find the Search Warrant authorized search of plaintiffs' undescribed, separate dwelling would run afoul of the Fourth Amendment's requirement that each living unit be particularly described. See Hinton, 219 F.2d at 326. The Fourth Amendment's particularity requirement was not met for the search of plaintiffs' separate dwelling. See Alcazar-Barajas, 768 F. App'x at 706-07; United States v. Busk, 693 F.2d 28, 30-31 (3rd Cir. 1982) (warrant authorizing entry into all apartments in a multiple dwelling house did not satisfy the particularity requirement of the Fourth Amendment).

The Warrant Clause categorically prohibits unreasonable searches of places inadequately described. Garrison, 480 U.S. at 84. Triable issues of fact exist on the question whether Detective Ester acted reasonably in preparing the Search Warrant and completing the Operating Plan for execution of the search of plaintiffs' home, and as to whether the search of plaintiffs' home and seizure of property therefrom was reasonable.

**III.   Michelle Bristow's Detention**

Defendants assert Michelle Bristow was released prior to the conclusion of the lawful search. (ECF No. 74-1 at 16, 19-21.) Under those circumstances, they argue, she was not unconstitutionally detained. (Id.)

"[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 704-05 (1981) (footnotes omitted). In a Summers-type detention, an officer need not "have particular suspicion that an individual is involved in criminal activity or poses a specific danger." Bailey v. United States, 568 U.S. 186, 193 (2013). "Inherent in [the] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." Muehler v. Mena, 544 U.S. 93, 98 (2005). However,

1   "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in
2   an unusual case...." Summers, 452 U.S. at 705 n. 21. "[A] detention may be unreasonable in a
3   particular instance either because the detention itself is improper or because it is carried out in an
4   unreasonable manner." Id. (citation omitted); see also Ganwich v. Knapp, 319 F.3d 1115, 1120
5   (9th Cir. 2003) (courts must generally balance privacy concerns and law enforcement concerns to
6   determine if the detention was reasonable). "[D]etaining a person in handcuffs during the
7   execution of a warrant to search for evidence is permissible… when justified by the totality of the
8   circumstances." Meredith v. Erath, 342 F.3d 1057, 1062-63 (2003); see also Robinson v Solano
9   County, 278 F.3d 1007, 1014 (9th Cir. 2002) (agreeing with the Third Circuit that the use of guns
10  and handcuffs must be justified by the circumstances).

11  Because a jury could find that Michelle Bristow was detained past the point of a lawful
12  search, triable issues of fact exist as to whether her detention violated the Fourth Amendment. See
13  Mena, 226 F.3d at 1041 (holding that a jury could find "detention past the point of a proper
14  search violated the Fourth Amendment"); Alcazar-Barajas, 768 F. App'x at 707 ("Because we
15  conclude that the search of Alcazar-Barajas' mobile home was not authorized by the warrant, it
16  similarly follows that officers' preliminary "seizure" of Alcazar-Barajas… was unauthorized by
17  the warrant.").

18  **IV.   Excessive Force**

19  Defendants argue Michelle Bristow was not subjected to unreasonable force, because
20  handcuffing is de minimis force, and because there is no supporting evidence of an injury other
21  than redness and temporary minor skin indentations. (ECF No. 74-1 at 21-23.) Plaintiffs respond
22  that Michelle Bristow suffered emotional injury. (ECF No. 76 at 16.) And further, the
23  circumstances included invasion of her home, the handcuffing, and the detention, which together
24  constituted unreasonable force. (Id.)

25  The "objective reasonableness" of law enforcement officers' use of force in a particular
26  case is determined "in light of the facts and circumstances confronting them, without regard to
27  their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 396-97 (1989). In
28  traditional excessive force cases, under Graham, a court first considers the nature and quality of

the alleged intrusion, and then considers the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Deorle v. Rutherford, 272 F.3d 1272, 1279-80 (9th Cir. 2001). At the heart of the Graham factors is the need, if any, for the force. Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1199 (2000). The Graham factors are not exclusive: a court examines the totality of the circumstances and considers "whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.'" Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (quoting Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994)).

The Ninth Circuit has long recognized that excessively tight handcuffs may constitute a Fourth Amendment violation. E.g., LaLonde v. County of Riverside, 204 F.3d 947, 960 (2000). The extent of any injury inflicted is one factor to be weighed under the applicable standard. See id. at 961. However, "there are no per se rules in the Fourth Amendment excessive force context[.]" Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011). A physical injury is not necessarily required. E.g., Robinson v. Solano Cty., 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc) (the pointing of a gun at someone may constitute excessive force even if it does not cause physical injury); but see Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (finding arrestee's conclusory allegations of handcuffing injury without supporting medical records or other evidence insufficient to withstand summary judgment on an excessive force claim).

An excessive force determination under the Fourth Amendment should only be taken from the jury in rare cases. E.g., Green v. City and County of San Francisco, 751 F.3d 1039, 1049 (2014). Here, though, there are no facts in the record from which Detective Ester could have known that Michelle Bristow's handcuffs were too tight. See Thompson v. Lake, 607 F. App'x 624, 625 (9th Cir. 2015) (assuming that the arrestee plaintiff was required to indicate that the handcuffs were too tight to show excessive force based on handcuffing).

When Detective Ester spoke with Michelle Bristow during her detention, at no time did Michelle Bristow indicate the handcuffs were causing her discomfort or pain. (UF 54.) It is

undisputed that Michelle Bristow did not indicate to any law enforcement officer that the handcuffs were too tight. (UF 63.) Other than when an unidentified law enforcement officer handcuffed Michelle Bristow and placed her into the police car, no other law enforcement officers placed their hands on Michelle Bristow. (UF 61.)

"Graham counsels that the facts that gave rise to an unlawful detention or arrest can factor into the determination whether the force used… was excessive." Velazquez v. City of Long Beach, 793 F.3d 1010, 1024 (9th Cir. 2015). But while the evidence for excessive force and unlawful detention claims may overlap, the two inquiries are separate and independent. See id.; Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007).

In the context of an unlawful arrest, all circuits to have addressed the question prohibit a finding of excessive force predicated only on the fact of the unlawful arrest. Velazquez, 793 F.3d at 1024 (citing collected cases and so holding); see also Mattos, 661 F.3d at 443 n. 4 (rejecting the plaintiffs' argument that "any amount of force against her" was excessive if the officers did not have probable cause to arrest).[3] Application of similar reasoning would prohibit a finding of excessive force predicated only on the fact of an alleged unlawful detention.

Here, Detective Ester had no physical contact with Michelle Bristow. Moreover, the record evidence to support a Fourth Amendment excessive force claim overlaps entirely with the evidence for the Fourth Amendment unreasonable detention claim. In this instance, the circumstances of the search and detention do not suffice to create triable issues of fact for a Fourth Amendment claim of excessive force by Detective Ester.

**V. Qualified Immunity**

Qualified immunity applies when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018); White v. Pauly, 580 U.S. 73, 78-79 (2017). "Clearly established" means the statutory or constitutional question was "beyond debate" such

---

[3] Nevertheless, "damages recoverable on an unlawful arrest claim include damages suffered because of the use of force in effecting the arrest." Velazquez, 793 F.3d at 1024 (internal quotation marks omitted).

that every reasonable official would understand that what he is doing is unlawful. See Wesby, 138 S. Ct. at 589; Vos v. City of Newport Beach, 892 F.3d 1024, 1035 (9th Cir. 2018). Whether a constitutional right was violated is generally a question of fact for the jury, but whether a right was clearly established is a question of law for the court. Morales v. Fry, 873 F.3d 817, 823 (9th Cir. 2017).

To be "clearly established," a rule must be dictated by controlling authority or a robust consensus of cases of persuasive authority. Wesby, 138 S. Ct. at 577; Vos, 892 F.3d at 1035; see also Perez v. City of Roseville, 882 F.3d 843, 856-57 (9th Cir. 2018) (Ninth Circuit precedent is sufficient to meet the "clearly established" prong of qualified immunity). A case "directly on point" is not required. Wesby, 138 S. Ct. at 577; Vos, 892 F.3d at 1035. Nonetheless, courts must define the law with a "high degree of specificity" when applying qualified immunity. Wesby, 138 S. Ct. at 590. The key question is "whether the violative nature of particular conduct is clearly established" in the specific context of the case. Vos, 892 F.3d at 1035.

In light of the triable issues of fact as to whether Detective Ester acted reasonably in preparing the Search Warrant and completing the Operating Plan for execution of the search of plaintiffs' home, defendants' qualified immunity arguments are unavailing as to Detective Ester. The Warrant Clause categorically prohibits unreasonable searches of places inadequately described. Garrison, 480 U.S. at 84. It is for a jury to decide whether Detective Ester acted reasonably, based on information he knew or should have known, to assure that the wrong house was not searched. See Navarro v. Barthel, 952 F.2d 331, 333 (9th Cir. 1991) (affirming denial of qualified immunity where triable issues remained as to whether the warrant described with sufficient particularity the location to be searched so as to prevent search of the wrong house).

**VI.    Monell Claim**

A local government may be liable for an injury under § 1983 if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). Here, plaintiffs argue summary judgment should be denied because defendants failed to meet their initial burden of providing the factual

matters that serve as the basis of their motion on this point. (ECF No. 76 at 18-19.)

The court rejects plaintiffs' argument that defendants failed to support their motion with citation to factual matters. Specifically, defendants put forward plaintiffs' written answers to Special Interrogatory number one, which asked the following: "State all facts in support of YOUR contention that Defendant County of San Joaquin violated YOUR Fourth Amendment rights during the incident on February 13, 2015 as alleged in YOUR Second Amended Complaint." (ECF No. 74-8 at 122, 142.)

Plaintiffs responded as follows:

> On the morning of February 13, 2015 employees of the County of San Joaquin Sheriff's Department along with many other agencies entered my home without a warrant and probable cause. Subjected me to unreasonable search and seizure of my property which was lawfully in my possession and refuses to return that property under a court order. The search warrant issued was for 4715 E. Harvest Road.

(Id.) Based on this response, defendants argued plaintiffs have no evidence that any violation, assuming one occurred, was caused by the custom, practice, or policies of the County sheriff's department, or that those policies are adhered to with deliberate indifference to citizens' rights. (UF 83.)

On an issue as to which the nonmoving party will have the burden of proof, a summary judgment movant can prevail by pointing out an absence of evidence to support the nonmoving party's case. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial. Celotex, 477 U.S. at 323. The County is entitled to summary judgment on plaintiffs' Monell claims because plaintiffs failed to put forth any responding evidence that the alleged conduct occurred pursuant to a governmental policy or custom. See Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).

**VII.  Second Amendment**

Defendants argue the evidence fails to show Danny Bristow's rights under the Second Amendment were violated. (ECF No. 74-1 at 24.) Plaintiffs' opposition addresses the rights at issue as violating the Fourth Amendment only. (See ECF No. 76 at 16-17.) Plaintiffs have,

therefore, abandoned Danny Bristow's claimed violations of rights under the Second Amendment. See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008) (claims not raised in opposition to summary judgment are deemed abandoned).

**CONCLUSION AND ORDER**

In accordance with the above, IT IS ORDERED that defendants' motion for summary judgment is granted in part and denied in part, as follows:

    a. GRANTED as to plaintiffs' claims against Detective Sangster;

    b. GRANTED as to plaintiffs' Monell claims;

    c. GRANTED as to plaintiff Danny Bristow's claims under the Second Amendment;

    c. GRANTED as to plaintiff Michelle Bristow's Fourth Amendment excessive force claim;

    d. DENIED as to plaintiffs' Fourth Amendment claims of unreasonable search and seizure;

    e. DENIED as to plaintiff Michelle Bristow's Fourth Amendment claim of unreasonable detention.

Dated: July 7, 2023

*/s/ Carolyn K. Delaney*
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

8
bris2712.msj